1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

UNITED STATES OF AMERICA,

No.  1:17-cr-00136-NONE

12

Plaintiff,

13

v.

ORDER DENYING DEFENDANT'S
MOTION FOR COMPASSIONATE
RELEASE

14

CRAIG SHULTS,

15

Defendant.

(Doc. Nos. 135, 141)

16
17
18

Pending before the court is a motion for a reduction of sentence and a subsequently filed

19

emergency motion for compassionate relief filed on behalf of defendant Craig Shults pursuant to

20

18 U.S.C. § 3582(c)(1)(A).  The motion is largely based on defendant's medical condition and the

21

risks allegedly posed to him by the ongoing coronavirus ("COVID-19") pandemic.  (Doc. Nos.

22

135, 141.)[1]  For the reasons explained below, defendant's motion will be denied.

23

**BACKGROUND**

24

On May 25, 2017, defendant was indicted in this action of retaliating against a federal

25

official by threat, specifically of threatening to assault a United States District Judge, in violation

26

of 18 U.S.C. § 115(a)(1)(B).  (Doc. No. 1.)  On December 14, 2018, defendant was found guilty

27
28

---

[1]  Unless otherwise indicated, all citations to the docket refer to the above-captioned case.

1

of that charge by a jury.  The relevant factual background leading up to defendant's conviction in this court will be summarized below.

From July 2009 to July 2010, defendant Shults and other individuals "devised and executed a real estate investment scheme to defraud investors," in which defendant "pitched the sale of REO [or real estate owned] properties" and "made false statements and promises to investors."  (Doc. No. 105 (Presentence Investigation Report, "PSR") ¶ 49.)  However, "most investors never received any properties while some investors were assigned properties that did not exist" and those few "who received actual properties got properties that had significant liens, were uninhabitable, or even condemned."  (*Id.*)  The 46 victims of defendant's scheme were defrauded out of a total of $6,063,057.  (*Id.*)

On April 18, 2012, defendant was indicted in the Central District of California on multiple counts of wire fraud, in violation of 18 U.S.C. § 1343.  (*See United States v. Craig Shults*, 8:12-cr-00090-JLS (C.D. Cal.), Doc. No. 1.)  He was arraigned on April 25, 2012 and released on bond with conditions under the supervision of pretrial services.  (*See id*. at Doc. No. 23.)  On October 21, 2013, United States District Judge Andrew Guilford found that defendant had violated the conditions of his pretrial supervision by continuing to solicit investments and ordered him remanded into federal custody pending trial.  (*Id*. at Doc. No. 172.)

While defendant was detained awaiting trial on the wire fraud charges, a witness (who would later testify at the trial of this case) heard defendant Shults make threats against Judge Guilford.  (Doc. No. 124 (Day 2 Jury Trial Tr.) at 15.)  According to that witness, defendant was angry that Judge Guilford did not release him on bond and stated he was going to "bury" Guilford and "get him."  (*Id.*)  The witness later reported these threats.  (*Id.* at 15–16, 20.)

On February 19, 2014, a jury convicted defendant on all seven counts of wire fraud with which he was charged in the United States District Court for the Central District of California.  (*Shults*, 8:12-cr-00090-JLS, Doc. No. 357.)  At sentencing in that case, defendant argued that the correct advisory sentencing guideline range called for a term of imprisonment between 57 and 71 months and that a "substantial variance" below that imprisonment range was appropriate.  (*Id*. at Doc. No. 463 at 3.)  On November 10, 2014, defendant was sentenced to a 90-month term of

1    imprisonment and ordered him to pay $2,000,000 in restitution.  (*Id*. at Doc. No. 503.)  Defendant

2    appealed his wire fraud conviction.  (*See United States v. Craig Shults*, No. 14-50515 (9th Cir.),

3    Doc. No. 1.)  On September 16, 2015, defendant moved for his release pending his appeal.

4    (*Shults*, 8:12-cr-00090-JLS, at Doc. No. 644.)  On October 2, 2015, Judge Guilford denied

5    defendant's motion for bail pending appeal.  (*Id*. at Doc. No. 648.)

6           By May 2016, defendant was incarcerated at Taft Correctional Institution ("Taft CI")

7    serving the 90-month sentence on the wire fraud charges.  At Taft CI, inmate and later trial

8    witness, W.K., heard defendant threaten to assault Judge Guilford in retaliation for the judge's

9    rulings during the prosecution of defendant's wire fraud case.  Defendant Shults reportedly

10   offered to W.K. that he, Shults, would take care of both of their sentencing judges, if W.K.

11   "would provide the funds."  (PSR ¶ 8.)  Defendant was recorded stating, among other things, "I'm

12   going to humiliate [Judge Guilford] first, then I'm going to get rid of him."  (Doc. No. 125 (Day 3

13   Jury Trial Tr.) at 209.)  Defendant Shults also stated he was "hunting" Judge Guilford, and

14   described scenarios where Judge Guilford could be "whack[ed]" out.  (*Id.* at 206, 211; *see also*

15   Doc. No. 130-1 (Excerpts from Government Tr. Exs.) at 69–71.)  For example, it was reported

16   that defendant told the witness that "he knew everything about Judge [Guilford], including where

17   he lived, his friends, the country club to which he belonged, and that he played basketball" on

18   certain nights.  (PSR ¶¶ 13, 16.)  By November 2016, defendant indicated that he had a contact at

19   the law firm where Judge Guilford had worked prior to becoming a federal judge.  (*Id.* ¶ 14.)

20   "The contact told [defendant] Shults about Judge [Guilford's] routines and memberships."  (*Id.*)

21          After officials at Taft CI became aware of the threats made by defendant that underly the

22   charges brought against him in this case, he was transferred to Lompoc Federal Correctional

23   Institution in Lompoc, California ("FCI Lompoc").  There, another trial witness, "P.V.," met

24   defendant in the beginning of 2017.  (Doc. No. 123 (Day 1 Jury Trial Tr.) at 166.)  According to

25   P.V., defendant repeatedly offered to pay P.V. to arrange for the murder of Judge Guilford, and

26   the murder of someone at Taft CI who had informed on defendant.  (*Id.* at 166–85.)  The PSR

27   indicates that defendant also offered to pay P.V. to kill the prosecutor in defendant's wire fraud

28   case.  (PSR ¶¶ 21–23.)  Defendant offered to pay P.V. $100,000 for each "hit."  (*Id.* ¶ 21–25.)

P.V. reported defendant's offers to prison officials after P.V. was transferred from FCI Lompoc to Taft CI.  (Day 1 Jury Trial Tr. at 183–85.)

On February 13, 2017, defendant filed a motion with the Ninth Circuit Court of Appeals seeking his release pending his appeal of his wire fraud conviction.  (*See Shults*, No. 14-50515, Doc. No. 44.)  That motion was denied on March 16, 2017, with the Ninth Circuit finding that "the district court did not err in finding that appellant failed to show, by clear and convincing evidence, that appellant is not likely to pose a danger to the safety of any other person or the community if released."  (*Id*. at Doc. No. 51.)

As noted above, on May 25, 2017, defendant was indicted in this case for retaliating against a federal official by threat in violation of 18 U.S.C. § 115(a)(1)(B).  (Doc. No. 1.)  On December 14, 2018, after a four-day trial, the jury convicted defendant on that charge based on the facts summarized above.  (Doc. No. 98.)  Following his conviction, it was determined that under the U.S. Sentencing Guidelines, defendant Shults' adjusted offense level in this case was 26[2] and his criminal history category was III, which would normally result in an advisory sentencing guideline range calling for a term of imprisonment of between 78 and 97 months. (PSR at 19.)  However, because the statutory maximum sentence for defendant's offense of conviction was 6 years, that statutory maximum became the guideline range.  (*Id.* ¶¶ 86–87.) Defendant Shults was sentenced in this case to the statutory maximum sentence of 72 months in the custody of the BOP with that sentence to run consecutively to the sentence imposed in the Central District of California on his wire fraud conviction, a 36-month term of supervised release to follow, and the $100 mandatory special assessment.  (Doc. Nos. 116; 117 at 2–3, 6; *see also* 127 (Sentencing Hr'g Tr. on March 11, 2019).)  Defendant appealed his conviction and sentence. (Doc. Nos. 118, 119.)

On April 13, 2020, defendant moved for release on bail pending appeal under 18 U.S.C. § 3143(b).  (Doc. No. 129.)  On June 24, 2020, the undersigned denied defendant's motion, reasoning in part that defendant failed to establish by clear and convincing evidence that he is

---

[2]  Defendant did not accept responsibility for the offense of conviction and, accordingly, there was no downward adjustment to the offense level.  (PSR ¶ 43.)

1  "not likely" to pose a danger to others as required under § 3143(b)(1)(A).  (Doc. No. 133 at 4–6.)

2  On July 22, 2020, the Ninth Circuit affirmed defendant's judgment of conviction and sentence.

3  (Doc. No. 134; *see United States v. Craig Shults*, No. 19-10106 (9th Cir.), *cert. denied*, No. 20-

4  5947 (Nov. 9, 2020).)

5  Defendant is currently serving his sentence at FCI Lompoc.  *Find an inmate*, FEDERAL

6  BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 17, 2021).  Defendant's

7  projected release date is May 18, 2025.  *Id.*  On July 24, 2020, defendant filed a *pro se* motion

8  for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 135.)  On September

9  30, 2020, following the court's referral of that motion to the Federal Defenders Office, appointed

10  counsel filed a supplemental opening brief in support of defendant's *pro se* motion.  (Doc. No.

11  141.)  On October 14, 2020, the government filed its opposition to the motions, and on October

12  21, 2020, defendant filed his reply thereto.  (Doc. Nos. 142, 143.)

13  **LEGAL STANDARD**

14  A court generally "may not modify a term of imprisonment once it has been imposed."  18

15  U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of

16  conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not

17  be modified by a district court except in limited circumstances.").  Those limited circumstances

18  include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp.

19  3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018 ("the FSA"),

20  motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A)

21  (2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for

22  compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the

23  FSA specifically provides that a court may

24  upon motion of the defendant after the defendant has fully
25  exhausted all administrative rights to appeal a failure of the [BOP]

26  /////

27  /////

28  /////

to bring a motion on the defendant's behalf[3] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –

(i)     extraordinary and compelling reasons warrant such a reduction; or

(ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[4]

---

[3]   If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the Regional Director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

[4]   Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was

6

1    The applicable policy statement with respect to compassionate release in the U.S.

2   Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

3   compelling reasons."  U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[5]; *see also*

4   *United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts

5   "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even

6   though that policy statement was issued before Congress passed the FSA and authorized

7   defendants to file compassionate release motions).  However, a large and growing number of

8   district courts across the country have concluded that because the Sentencing Commission has not

9   amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA

10   categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling

11   circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c).  *See,*

12   *e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 978–79 (C.D. Cal. 2020) (collecting cases);

13   *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

14    In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

15   defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

16   *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

17   has not specifically addressed the question of which party bears the burden in the context of a

18   motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts

19   that have done so have agreed that the burden remains with the defendant.  *See, e.g.*, *United*

20   *States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020);

---

22   released to home confinement after serving less than half his sentence from a facility that reported
no positive COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort*

23   *Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.
com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the

24   prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release
prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid*

25   *COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-

26   manafort-released-from-prison-amid-covid-19-fears.

27   [5]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18
U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person

28   or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1  *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7,

2  2020).

3  **ANALYSIS**

4      As district courts have summarized, in analyzing whether a defendant is entitled to

5  compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

6  defendant has satisfied three requirements:

7          First, as a threshold matter, the statute requires defendants to
        exhaust administrative remedies.   18 U.S.C. § 3582(c)(1)(A).

8          Second, a district court may grant compassionate release only if
        "extraordinary and compelling reasons warrant such a reduction"

9          and "that such reduction is consistent with applicable policy
        statements issued by the Sentencing Commission. *Id.*  Third, the

10          district court must also consider "the factors set forth in Section
        3553(a) to the extent that they are applicable." *Id.*

11

12  *Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-

13  LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973–74;

14  *United States v. Trent*, Case No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

15  2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

16  "consistent with" the sentencing factors set forth in 18 U.S.C. § 3553(a)).

17  **A.**      **Administrative Exhaustion**

18      On June 20, 2020, defendant Shults submitted an administrative request to the Warden at

19  FCI Lompoc seeking compassionate release due to his medical condition.  (Doc. No. 141 at 35.)

20  On July 30, 2020, the Warden denied defendant's administrative request seeking compassionate

21  release.  (*Id.* at 39.)  The government concedes that defendant exhausted his administrative

22  remedies.  (Doc. No. 142 at 4.)  Because failure to exhaust is normally viewed as an affirmative

23  defense, which must be pled and proven, the court will accept the government's concession and

24  turn to the merits of defendant's motion.

25  **B.**      **Extraordinary and Compelling Reasons**

26      "Extraordinary and compelling reasons" warranting compassionate release may exist

27  based on a defendant's medical conditions, age and other related factors, family circumstances, or

28  "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all "other reasons"

1    was included in the policy statement at a time when only BOP could bring a compassionate

2    release motion, courts have agreed that it may be relied upon by defendants bringing their own

3    motions under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-JAM, 2020 WL

4    2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

5         Thus, the medical condition of a defendant may warrant compassionate release where he

6    or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

7    trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a

8    specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).  Non-exhaustive

9    examples of terminal illnesses that may warrant the granting of a compassionate release "include

10   metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and

11   advanced dementia."  *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or

12   mental condition may warrant compassionate release, including when:

13        The defendant is

14        (I)   suffering from a serious physical or medical condition,

15        (II)  suffering from a serious functional or cognitive impairment, or

16        (III) experiencing deteriorating physical or mental health because of
17        the aging process,

18        that substantially diminishes the ability of the defendant to provide
          self-care within the environment of a correctional facility and from
19        which he or she is not expected to recover.

20   *Id.* at cmt. n.1 (A)(ii).  Where a defendant has moderate medical issues that otherwise might not

21   be sufficient to warrant compassionate release under ordinary circumstances, some courts have

22   concluded that the risks posed by COVID-19 may tip the scale in favor of release in particular

23   situations.  *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405–06 (E.D. Pa. 2020)

24   ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's

25   health problems, proximity to his release date, and rehabilitation would not present extraordinary

26   and compelling reasons to reduce his sentence.  But taken together, they warrant reducing his

27   sentence.").

28   /////

Compassionate release may also be warranted based on a defendant's age and other related factors.  In these situations, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1 (B).[6]  In determining a defendant's projected release date, courts may take into account any "good time credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18 U.S.C. § 3624(b)(1).  *See, e.g.*, *United States v. Burrill*, 445 F. Supp. 3d 22, 24 n.1 (N.D. Cal. 2020).

Here, defendant Shults argues that extraordinary and compelling reasons warranting his compassionate release exist due to his medical conditions and his imprisonment at FCI Lompoc, which he contends has "persistent and well-documented lack of Personal Protective Equipment, inadequate health care and an inability to socially distance inmates . . . ."  (Doc. No. 141 at 6.)  To qualify for compassionate release, defendant must demonstrate that he is suffering from some "serious" medical condition "that substantially diminishes [his] ability . . . to provide self-care" in FCI Lompoc and the medical condition is one "from which he . . . is not expected to recover."  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  More specifically here, defendant argues that his obesity, hypertension, hyperglycemia, hyperlipidemia, chronic lung issues, severe acid reflux, his age, and other health ailments put him at greater risk for becoming severely ill if he were to contract COVID-19.  (Doc. Nos. 135 at 8, 19, 35–37; 141 at 6, 18–21.)  While defendant was serving his sentence on his prior federal wire fraud conviction and pending sentencing in this case, it was noted he "was diagnosed with high blood pressure and suffered from severe allergies."  (PSR ¶ 71.)  It was also noted that he was prescribed medication to treat his high blood pressure and acid reflux, and provided over-the-counter medication as needed to treat his allergies.  (*Id.* ¶ 70–71.)  Additionally, defendant has had surgery for severe acid reflux in 1988 and surgery for Gastroesophageal Reflux Disease ("GERD") at an unspecified date.  (*Id.*)

_____

[6]  Because defendant Shults is only 50 years old (*see* PSR at 2), these age and age-related factors are irrelevant to the court's disposition of the pending motion.

Defendant Shults is now 50 years old and asserts that he suffers from a variety of ailments.[7]  (Doc. No. 141 at 6, 18–21.)  According to defendant's BOP medical records, generated in August 2020, defendant currently suffers from allergic rhinitis and esophageal reflux.[8]  (Doc. No. 141 at 41.)  Additionally, the same BOP medical records indicate that defendant's "[o]ther and unspecified hyperlipidemia," "[h]ypertension, [b]enign [e]ssential," and "[c]onfirmed case COVID-19" have been "resolved."  (*Id.*)  Defendant is 6'5" (PSR at 2) and it is unclear from the evidence before the court how much he currently weighs.  Nonetheless, the CARES/RIS Summary submitted with the government's opposition indicates that defendant's BMI is greater than 30.  (Doc. No. 142-1 at 67.)  Defendant indicates in his reply brief that his BMI "has been upgraded to 35.78," though he has not submitted any evidence to support this contention.  (Doc. No. 143 at 7–8.)  In any event and for purposes of this motion, the court will accept that defendant has a BMI of greater than 30.

According to the U.S. Centers for Disease Control and Prevention ("CDC"), defendant is at higher risk of becoming severely ill if he contracts COVID-19 due to his obesity.  *See COVID-19: People Who Are at Increased Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Feb. 17, 2021).  Defendant has not presented evidence suggesting that he *currently* suffers from hypertension or high blood pressure.  In an abundance of caution, however, the court will also assume that he suffers from hypertension and high blood pressure conditions, which may place him "at an increased risk for severe illness" from COVID-19.  *Id.*

---

[7]  Defendant claims that he suffers from chronic asthma, obesity, hyperglycemia, hypertension, hyperlipidemia, severe esophageal reflux, acute sinusitis, chronic sinusitis, allergies, chronic lung infections, upper respiratory infections, and the possible "reinfection by COVID-19 or infection by another viral disease."  (Doc. Nos. 135 at 8, 19, 35–37; 141 at 6, 18–21.)  The government disputes defendant's contentions that he suffers from asthma.  (Doc. No. 142 at 9 n.2.)  The court notes that defendant's CARES/RIS assessment indicates that he does not have moderate or severe asthma.  (Doc. No. 142-1 at 67.)  Nor do his BOP medical records reflect that Shults suffers from asthma.  (*See generally* Doc. No. 141 at 41–44.)  In addition, nothing in the record supports defendant's contention that he currently suffers from chronic lung infections and upper respiratory infections.

[8]  Not "severe" esophageal reflux, as defendant contends.  (*See, e.g.*, Doc. No. 141 at 6.)

11

1   Although defendant suffers from other medical conditions, none of those ailments place him at

2   greater risk of contracting a severe illness from COVID-19, according to the CDC.  Still, for

3   purposes of this motion, the court will assume that defendant suffers from three comorbidities.

4   As the CDC recognizes, "[t]he more underlying medical conditions someone has, the greater their

5   risk is for severe illness from COVID-19."  *Id.*  Finally, defendant is 50 years old, which places

6   him at some greater risk of severe illness from the virus compared to younger individuals.  *Id.*

7   (stating those between 50 and 64 years old are four times more likely to require hospitalization

8   and 30 times more likely to die from COVID-19 compared to 18-and-29-year-old individuals).

9           However, the risk posed to defendant from COVID-19 must be assessed in light of the

10  current circumstances established by the evidence before the court.  At this point, defendant's

11  actual risk of contracting a severe illness due to COVID-19 is speculative.  On May 6, 2020,

12  defendant was diagnosed with COVID-19.  (Doc. No. 141 at 41.)  His COVID-19 diagnosis is

13  listed by the BOP as "resolved."  (*Id.*)  Defendant contends that he suffered from a "mild" case of

14  COVID-19.  (*See, e.g.*, Doc. No. 141 at 21.)  Defendant's BOP medical records state that his

15  confirmed case of COVID-19 was resolved about 14 days after he tested positive, indicating that

16  defendant did not suffer from any COVID-19-related symptoms in that period of time.  *See*

17  *COVID-19: When to Quarantine*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

18  https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (last visited Feb. 17,

19  2021) ("Watch for symptoms until 14 days after exposure.").

20          Defendant argues that a mild case of COVID-19 neither immunizes him from reinfection

21  nor insures him against a much more severe bout of COVID-19, other viral infections, "or the

22  lingering complications from his initial illness (often referred to as 'longhauler' syndrome)."

23  (Doc. No. 141 at 21.)  As such, defendant asserts that his having been diagnosed with COVID-19

24  in May 2020 weighs in favor of his release at this time.  (*See id.*)  In this regard, many courts have

25  "err[ed] on the side of caution to avoid potentially lethal consequences" because "the science is

26  unclear on whether reinfection is possible."  *United States v. Yellin*, No. 3:15-cr-3181-BTM-1,

27  2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020) (finding extraordinary and compelling

28  reasons exist where a COVID-positive inmate at FCI Terminal Island, who did not develop severe

12

symptoms, suffered from a combination of medical conditions that placed him at risk of serious complications from COVID); *see also United States v. Hanson*, 470 F. Supp. 3d 1197, 1202 (D. Or. 2020) ("[T]here is no current scientific evidence to indicate that a 'recovered' COVID-19 patient is immune from reinfection, as several courts have recently acknowledged. . . . [T]he Court remains concerned about FCI Terminal Island's ability to provide adequate care in light of defendant's complex medical needs.  The Court is not convinced that FCI Terminal Island has been successfully mitigating the risk of reinfection, given the high numbers of infected inmates and Defendant's own contraction of the virus.").  Other courts have taken the position that uncertainty surrounding the danger of reinfection from COVID-19 "cuts against compassionate release," in part because it is the defendant's burden to establish that "extraordinary and compelling reasons" justifying compassionate release exist.  *See United States v. Molley*, No. CR15-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020).

Here, the court concludes out of an abundance of caution that because of his age, obesity, and purported hypertension and high blood pressure—combined with the risk of reinfection from COVID-19—defendant Shults has and is "suffering from a serious physical . . . condition . . . from which he . . . is not expected to recover."  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii). However, to establish extraordinary and compelling reasons justifying his compassionate release, defendant must still demonstrate that his medical conditions "substantially diminish[] [his] ability . . . to provide self-care" in FCI Lompoc.  *See id.*

Based on the record now before it, the court concludes that defendant has failed to demonstrate that he is significantly hindered in providing himself with care while in prison. Defendant argues that while the majority of inmates at FCI Lompoc have already been infected, "immunity is not a certainty nor is it permanent.  At best it might be for a little less than a year as seen in other viruses, but with COVID-19 it is unknown[.]"  (Doc. No. 143 at 3.)[9]  As a threshold issue, defendant ignores that it is his burden to demonstrate extraordinary and compelling reasons

/////

---

[9]  Defendant appears to be referring to the report entitled "COVID-19 Inspection of BOP Lompoc by Dr. Homer Venters."  (Doc. No. 141 at 67–97.)

1   justifying compassionate release, and thus his argument regarding reinfection being "unknown"

2   would also appear to weigh in favor of denying his motion.

3          Regardless, it is clearly true that FCI Lompoc suffered from a significant COVID-19

4   outbreak, with the BOP reporting 647 inmates and 22 staff who tested positive but recovered,

5   while three inmates at that prison having died at the hands of the virus.  *COVID-19*, FEDERAL

6   BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Feb. 16, 2021).[10]  At the

7   moment, however, there are currently zero active COVID-19 cases among inmates and two active

8   cases among staff members.[11]  *Id.*  Thus, it appears from that reporting that the status of any virus

9   outbreak at defendant Shults' institution of confinement has now been reasonably controlled.

10  However, the court does not find this fact alone to be dispositive as to whether defendant can

11  properly care for himself while incarcerated at FCI Lompoc.  Aside from citing the general

12  possibility of contracting COVID-19 again—the risk of which appears speculative for an

13  individual who contends he had a mild case when he previously contracted the virus[12]—defendant

14  has not established that he is presently "substantially" inhibited in providing "self-care" in FCI

15  Lompoc.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  For example, the court observes that an

16  investigator working at the direction of defense counsel's firm stated that he contacted Bryan

17  Rana, a correctional counselor at FCI Lompoc, regarding defendant.  (Doc. No. 143 at 16–17.)  It

18

19  [10]  FCI Lompoc has a population of only 874 inmates.  *FCI Lompoc*, FEDERAL BUREAU OF
    PRISONS, https://www.bop.gov/locations/institutions/for/ (last visited Feb. 17, 2021).

20

21  [11]  While the undersigned does not necessarily accept these reported numbers at face value in
    light of CDC guidelines with respect to both testing and manner of counting "active cases," and

22  defendant disputes with the government's contention that there had been only two inmate deaths
    suffered at the hands of the virus at the time defendant's opposition to the pending motion was

23  filed, there is also no evidence before the court in this case challenging those numbers reported by
    the BOP.

24

25  [12]  Defendant cites an article from the *Boston Globe* in support of his motion, but has not attached
    it as an exhibit to his motion nor provided a full citation to it.  (Doc. No. 141 at 21–22.)  In a

26  single footnote in a report regarding FCI Lompoc that was submitted in another case pending in
    the Central District of California, Dr. Venters stated that the "CDC has reported immunity from

27  COVID-19 reinfection as potentially limited to 90 days."  (Doc. No. 141 at 91 n.10.)  Even if the
    court accepted the veracity of the representation made in that footnote, it would merely confirm

28  that, at the moment, the possibility of reinfection is speculative and far from certain.

1   was noted that Correctional Counselor Rana confirmed Shults' responsibilities as "lead orderly"

2   includes the maintenance, cleaning, and overseeing of other orderlies in their dorm which houses

3   approximately 200 individuals.  (*Id.*)  Correctional Counselor Rana is reported to have stated that

4   defendant "work[ed] hard sanitizing his dorm to prevent the spread of the COVID19 virus" and

5   that in April and May 2020, defendant "aggressively maintained a clean environment within his

6   dorm to combat the COVID19 virus."  (*Id.*)  Thus, based on the limited evidence before the court,

7   it appears that defendant is doing well at FCI Lompoc.  Certainly defendant has not pointed to

8   any evidence suggesting that his current physical condition is deteriorating or concerning.  *See*

9   *United States v. McCollough*, No. 15-cr-00336-001-PHX-DLR, 2020 WL 2812841, at *2 (D.

10  Ariz. May 29, 2020) ("Since Defendant has contracted COVID-19, the relevant questions concern

11  (1) the course of his illness, (2) the state of his health, (3) his prognosis, and (4) the adequacy of

12  the care and treatment being provided to him in BOP given his pre-existing conditions. . . . There

13  is no evidence that the circumstances surrounding Defendant's health or treatment are

14  extraordinary or compelling.").  Furthermore, it also does not appear that the BOP medical staff at

15  FCI Lompoc is unable to provide defendant with proper care.

16          While there is still some unknown risk to defendant due to the possibility that he could be

17  reinfected with COVID-19, that speculative possibility provides no basis upon which the court

18  could conclude that defendant is presently "substantially diminishe[d]" in his ability to "provide

19  self-care" at FCI Lompoc.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Thus, defendant Shults has

20  failed to carry his burden in this regard.  *See Greenhut*, 2020 WL 509385, at *1 ("The defendant

21  bears the initial burden to put forward evidence that establishes an entitlement to a sentence

22  reduction.").

23          Accordingly, in this case, the court does not find extraordinary and compelling reasons

24  justifying compassionate release pursuant to § 3582(c)(1)(A).

25  /////

26  /////

27  /////

28  /////

15

1   **C.     Consistency With the § 3553(a) Factors**

2          Finally, as noted above, any relief to be granted pursuant to 18 U.S.C. § 3582(c)(1)(A)

3   must be consistent with the sentencing factors set forth in §3553(a).[13]  *Trent*, 2020 WL 1812242,

4   at *2; *see also Parker*, 461 F. Supp. 3d at 981.  Here, consideration of the § 3553(a) sentencing

5   factors also do not support defendant Shults' release from imprisonment at this time.

6          Defendant's criminal conduct that resulted in his conviction in this case was particularly

7   egregious in threatening his original sentencing judge and taking steps to hire an individual to

8   arrange the murder of that judge.  As summarized above, the facts of the instant case were

9   extremely troubling and a jury found defendant's threats to be credible.  Accordingly, the district

10  judge previously assigned to this case sentenced defendant to the maximum term of 72 months of

11  imprisonment, a sentence that was also consistent with the advisory sentencing guideline

12  calculation.  (Doc. No. 117 at 2.)  The 72-month sentence in this case was imposed consecutive to

13  the original 90-month sentence imposed on defendant in the Central District of California for his

14  wire fraud convictions, for an aggregate term of imprisonment of 162 months for both cases.  (*Id.*;

15  Doc. No. 142-1 at 70–71.)  As of the date of this order, defendant has served approximately 87

16  months in prison.  (Doc. No. 142-1 at 72 (Inmate Data as of May 1, 2020).)  Taking into account

17  good time credits earned, it appears that defendant relatively recently began serving his prison

18  sentence for retaliating against the sentencing judge in his first conviction.  (*See id.*)

19         Based on the evidence of record in this case, a downward variance from the sentencing

20  guideline range and a reduction of defendant's sentence is simply not justified.  Although the

21  _____

22  [13]  Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court
    shall consider:  the nature and circumstances of the offense and the history and characteristics of

23  the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote
    respect for the law, provide just punishment for the offense, afford adequate deterrence, protect

24  the public from further crimes of the defendant and provide the defendant with needed
    educational or vocational training, medical care, or other correctional treatment in the most

25  effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range
    established for the applicable category of offense committed by the applicable category of

26  defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing
    Commission; the need to avoid unwarranted sentence disparities among defendants with similar

27  records who have been found guilty of similar conduct; and the need to provide restitution to any
    victims of the offense.

28

court notes defendant's post-incarceration rehabilitation efforts, including his earning of a college degree and paralegal certificate (Doc. No. 141 at 28–29, 46–49), those efforts are insufficient to overcome the serious and egregious nature of his criminal conduct that resulted in his conviction in this case. In the undersigned's view, a sentence of approximately 87 months (essentially a 75-month reduction of the total aggregate sentence imposed in both cases), would not reflect the seriousness of defendant's offense of conviction in this action, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct. *See* § 3553(a); *see also United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020); *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993, at *5–6 (N.D. Cal. May 26, 2020) ("The length of the sentence remaining is an additional factor to consider in any compassionate release analysis, with a longer remaining sentence weighing against granting any such motion." (citation omitted)).[14] Because the court concludes that granting defendant Shults' compassionate release at this time would be inconsistent with the

/////

---

[14] Defendant suggests that the court amend the conditions of his sentence to require him to serve the remaining custodial term on home confinement. (Doc. No. 141 at 6, 31.) First, the CARES Act "'authorizes the BOP—not courts—to expand the use of home confinement' under 18 U.S.C. § 3624(c)(2)." *United States v. Fantz*, No. 5:14-cr-32-BR, 2020 WL 3492028, at *1 (E.D.N.C. June 26, 2020) (quoting *United States v. Nash*, No. 19-cr-40022-01-DDC, 2020 WL 1974305, at *2 (D. Kan. Apr. 24, 2020) (collecting cases)); *see also United States v. Rice*, No. 12-cr-818-PJH, 2020 WL 3402274, at *4 (N.D. Cal. June 19, 2020) (denying a defendant's request for release to home confinement made in conjunction with his motion for compassionate release because "the court has no authority to designate the place of confinement" and the "Bureau of Prisons has the statutory authority to choose the locations where prisoners serve their sentence."); *United States v. Gray*, No. 4:12-cr-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (holding that the CARES Act "does not authorize the court to order defendant's placement in home confinement"). The district court may only impose home detention as a condition of supervised release, rather than as part of a sentence of imprisonment. *See United States v. Connell*, No. 18-cr-00281-RS, 2020 WL 2315858, at *5, n.6 & *7 (N.D. Cal. May 8, 2020). Accordingly, to do as defendant requests, the court would be required to reduce his sentence to one of time served and modify the conditions of supervised release to require home confinement for the remainder of his sentence. The court is unwilling to do so for the reasons set forth above. The BOP knows its capabilities to effectively and appropriately care for defendant Shults in a custodial setting. If the BOP determines that defendant should be released to home confinement to serve his sentence under the Attorney General's expanded authority in that regard, the court trusts it will do so. The issue that this court resolves is merely whether in its view, under the applicable legal standards, defendant's sentence should be reduced at this time.

1   appropriate consideration of the § 3553 sentencing factors, his motion will be denied on this basis

2   as well.

3                                                    **CONCLUSION**

4          For the reasons explained above, the court concludes that defendant has not demonstrated

5   "extraordinary and compelling reasons" exist warranting his compassionate release from prison.

6   Moreover, the court finds that the granting of release at this time would not be consistent with

7   consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).  Accordingly, defendant's

8   motion for compassionate release (Doc. Nos. 135, 141) is denied.

9   IT IS SO ORDERED.

10      Dated:   **February 17, 2021**                   _____

11                                                       UNITED STATES DISTRICT JUDGE

18