**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:17-cr-00136 JLT SKO |
| Plaintiff, | ORDER DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255 AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |
| v. | |
| CRAIG SHULTS, | |
| Defendant. | (Docs. 154, 175) |

Craig Shults is a federal prisoner moving to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. (Docs. 154, 175.) He filed his original motion on November 8, 2021 and an amended motion on March 3, 2022. (*Id.*) The government opposes the motion. (Doc. 187.) For the reasons set forth below, the motion is **DENIED**, and the Court declines to issue a certificate of appealability.

**I.     Background**

On May 25, 2017, Shults was indicted for retaliating against a federal official in violation of 18 U.S.C. § 115(a)(1)(B). (Doc. 1.) These charges stemmed from threats Shults made against a United States District Judge in proceedings related to a wire fraud case against Shults.

    **A.     Wire fraud case**

On April 18, 2012, Shults was indicted in the Central District of California on multiple counts of wire fraud, in violation of 18 U.S.C. § 1343. (*See United States v. Craig Shults*, 8:12-cr-

1

00090-JLS (C.D. Cal.), Doc. 1.) He was arraigned on April 25, 2012, and released on bond with conditions under the supervision of pretrial services. (*See id*. at Doc. 23.) On October 21, 2013, United States District Judge Andrew Guilford found that Shults had violated the conditions of his pretrial supervision by continuing to solicit investments and ordered him remanded into federal custody pending trial. (*Id*. at Doc. 172.)

On February 19, 2014, a jury convicted Shults on all seven counts of wire fraud with which he was charged in the United States District Court for the Central District of California. (*Shults*, 8:12-cr-00090-JLS, Doc. 357.) At sentencing in that case, Shults argued that the correct advisory sentencing guideline range called for a term of imprisonment between 57 and 71 months and that a "substantial variance" below that imprisonment range was appropriate. (*Id*., Doc. 463 at 3.) On November 10, 2014, Shults was sentenced to a 90-month term of imprisonment and ordered to pay $2,000,000 in restitution. (*Id*. at Doc. 503.) Shults appealed his wire fraud conviction. (*See United States v. Craig Shults*, No. 14-50515 (9th Cir.), Doc. 1.) On September 16, 2015, Shults moved for his release pending appeal, which Judge Guilford denied. (*Shults*, 8:12-cr-00090-JLS, at Docs. 644, 648.)

While Shults was detained awaiting trial on the wire fraud charges, he allegedly made threats against Judge Guilford to inmate Carlos Galeana. (*See* Doc. 124 at 15.) According to Galeana, Shults was angry that Judge Guilford did not release him on bond and stated he was going to "horse F" Guilford and "bury" him. (*Id*. at 15:12-14.) Galeana later reported these threats. (*Id*. at 16:19-25.)

**B.     Retaliation case**

By May 2016, Shults was incarcerated at Taft Correctional Institution serving his 90-month sentence on the wire fraud charges. At Taft, inmate and later trial witness, William Knox, heard Shults threaten to assault Judge Guilford in retaliation for the judge's rulings during the prosecution of Shults' wire fraud case. FBI Agents met with Knox on various occasions beginning in September 2016, during which Knox reported Shults' statements about Judge Guilford. (*See* Doc. 105 at 4-5 ¶¶ 8-15.) Shults reportedly offered to Knox that he would take care of both of their sentencing judges, if Knox "would provide the funds." (Doc. 105 at 4-5 ¶ 8.)

1   Shults was recorded stating, among other things, "I'm going to humiliate [Judge Guilford] first,

2   then I'm going to get rid of him." (Doc. 125 at 209:2-5.) Shults also stated he was "hunting"

3   Judge Guilford, and described scenarios where Judge Guilford could be "whack[ed]" out. (*Id*. at

4   206:8-12, 211:1-2; *see also* Doc. 130-1 at 69-71.) For example, it was reported that Shults told

5   Knox that "he knew everything about Judge [Guilford], including where he lived, his friends, the

6   country club to which he belonged, and that he played basketball" on certain nights. (Doc. 105 at

7   5-6 ¶¶ 13, 16.) By November 2016, Shults indicated that he had a contact at the law firm where

8   Judge Guilford had worked prior to becoming a federal judge. (*Id*. at 5 ¶ 14.) "[Knox] told Shults

9   about Judge [Guilford's] routines and memberships." (*Id*.) Eventually, on December 11, 2016,

10  Knox wore a recording device provided by the FBI for the purposes of recording Shults' threats.

11  (*Id*. at 6 ¶ 16.)

12       In early 2017, after officials at Taft became aware of the threats made by Shults that

13  underly the charges brought against him in this case, he was transferred to Lompoc Federal

14  Correctional Institution. (Doc. 105 at 6 ¶ 20.) There, Shults met another inmate, Pavel Valkovich.

15  (*Id*., Doc. 123 at 165-66.) According to Valkovich, Shults repeatedly offered to pay him to

16  arrange for the murder of Judge Guilford, as well as the murder of someone at Taft who had

17  informed on Shults. (*Id*. at 166-85.) The presentence report indicates that Shults also offered to

18  pay Valkovich to kill the prosecutor in Shults' wire fraud case. (Doc. 105 at 6-7 ¶¶ 21-23.) Shults

19  offered to pay him $100,000 for each "hit." (*Id*. ¶¶ 21-25.) Valkovich reported Shults' offers to

20  prison officials after Valkovich was transferred from Lompoc to Taft. (*See* Doc. 123 at 183-85.)

21       On May 25, 2017, Shults was indicted for retaliating against a federal official by threat in

22  violation of 18 U.S.C. § 115(a)(1)(B) in connection with the facts summarized above. (Doc. 1.)

23  On December 14, 2018, after a four-day trial, the jury convicted Shults. (Doc. 98.) Shults was

24  sentenced to the statutory maximum sentence of 72 months in the custody of the Bureau of

25  Prisons, to run consecutively to the sentence imposed on his wire fraud conviction, with a 36-

26  month term of supervised release to follow. (Doc. 117 at 2-3; *see also* Docs. 116, 127.) Shults

27  appealed his conviction and sentence, (Docs. 118, 119), which the Ninth Circuit affirmed on July

28  22, 2020. (Doc. 134.) Shults then petitioned the United States Supreme Court for a writ of

certiorari, which was denied on November 9, 2020. (*See* Doc. 175 at 2.)

On November 8, 2021, Shults filed a timely 28 U.S.C. § 2255 motion along with a Motion for Extension of Time to File a Memorandum of Law and Facts in support of the motion. (Docs. 154, 155.) On November 10, 2021, the Court set January 10, 2022 as the deadline for Shults to file a motion to amend his § 2255 motion and directed Shults to attach "the proposed memorandum of law" and include "any relevant argument regarding the application of Rule 15." (Doc. 159 at 2.)

After being granted two additional extensions, (*see* Docs. 168, 169, 172, 174), Shults filed an amended § 2255 motion and Memorandum of Points and Authorities on March 3, 2022.[1] (Docs. 175, 175-1.) Shults alleges ineffective assistance of counsel based on the following four grounds: (1) counsel did not call him to testify; (2) counsel failed to call two witnesses; (3) counsel failed to properly question a witness; and (4) counsel failed to obtain and call an expert witness. (*Id.*)[2]

---

[1] Shults' original motion, filed on November 8, 2021, was timely pursuant to 28 U.S.C. § 2255(f), and the amendment thereto filed on March 3, 2022 (though untimely pursuant to § 2255(f)), relates back to the original motion. *See* Fed. R. Civ. P. 15(c); *Mayle v. Felix*, 545 U.S. 644, 664 (2005) ("So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order."). The government does not meaningfully argue otherwise, despite the Court directing the government to raise any Rule 15 arguments in its opposition. (*See* Doc. 187 at 29 n.9 [asserting only that "[t]o the extent Shults's Amended 2255 Motion and the Supporting Memorandum of Points and Authorities do not relate back to his originally-filed motion they should be denied . . ."]; Doc. 178.)

However, the government objects to the amended motion being filed after the Court's February 28, 2022 deadline, while recognizing Federal Rule of Civil Procedure 15(a)(2), which states that "'the court should freely give leave [to amend] when justice so requires.'" (Doc. 187 at 29 n.9.) The Court notes that both Shults' amended motion and reply were filed late, without any explanation from counsel. Though the Court has authority to strike these filings in the interest of justice, it has considered the late-filed papers. Furthermore, the government offers no basis for its objection and such filing does not appear to have prejudiced the government. For example, the late filing did not shorten the government's time to respond. In fact, the Court issued a scheduling order directing the government to file a response more than three months after the amended motion was filed and yet the government was still afforded the standard 60-day deadline to do so. (*See* Doc. 178.) The government then filed a stipulation to extend the deadlines set forth in the scheduling order by thirty days and made no mention of the timeliness of Shults' motion. (*See* Doc. 180.) The Court granted the request and the government filed—over six months after the amended motion was filed—a 52-page opposition addressing in depth each issue raised in Shults' motion. Based on these considerations, and the Court's continual endeavor to adjudicate each case upon its merits, the government's objection is overruled.

[2] Shults was represented by two assistant federal defenders in this case: Charles Lee and Erin Snider, both of whom appear to have been involved in the decisions at issue. Shults does not distinguish between the two attorneys in asserting his claims. Thus, the Court will not assume Shults asserts his claims over one attorney or the other and, for ease of understanding, will refer to Mr. Lee and Ms. Snider, collectively, as

On June 13, 2022, the Court ordered the government to file a response within 60 days. (Doc. 178.) By stipulation, the Court continued the government's opposition deadline to September 8, 2022, and Shults' reply deadline to November 11, 2022. (Docs. 180, 188, 189.) The government filed its opposition on September 8, 2022, to which Shults replied on November 14, 2022. (Docs. 187, 191.)

## II.    Legal Standards

### A.      28 U.S.C. § 2255

Title 28 U.S.C. § 2255 allows a federal prisoner to move "to vacate, set aside or correct the sentence" on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. A federal prisoner is entitled to relief under § 2255 "[i]f the court finds that . . . there has been . . .a denial or infringement of the constitutional rights of the prisoner . . ." 28 U.S.C. § 2255(b). "In general, § 2255 provides the exclusive procedural mechanism by which a federal prisoner may test the legality of detention." *Lorentsen v. Hood*, 223 F.3d 950, 953 (9th Cir. 2000).

Generally, only a narrow range of claims fall within the scope of § 2255. *United States v. Wilcox*, 640 F.2d 970, 972 (9th Cir. 1981). To warrant relief, a movant must demonstrate the existence of an error of constitutional magnitude that had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003) ("We hold now that *Brecht*'s harmless error standard applies to habeas cases under section 2255, just as it does to those under section 2254."). The alleged error of law must be "a fundamental defect which inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346 (1974) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

"Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994); *Gustave v. United States*,

"counsel."

627 F.2d 901, 904 (9th Cir. 1980) ("We also concur in the dismissal of the allegations … as vague, conclusory and without any facts alleged in support of the claim."); *Neighbors v. United States*, 457 F.2d 795, 795 (9th Cir. 1972) (affirming denial of § 2255 motion where allegations regarding ineffective assistance of counsel were entirely conclusory and without support in the record).

### B.   Ineffective assistance of counsel

The Sixth Amendment "entitles an accused to the effective assistance of counsel at trial." *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir. 2000) (citing *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970)). Ineffective assistance of counsel claims may be heard on collateral review even if a defendant could have, but failed to, bring those claims on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003). To demonstrate an ineffective assistance of counsel claim, a movant must show that counsel's performance was deficient and prejudicial to movant. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The court may address either prong first and need not address both components of the inquiry if one fails. *See id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *see also United States v. Sanchez-Cervantes*, 282 F.3d 664, 672 (9th Cir. 2002) ("If either prong is not met, the claim must be dismissed.").

"Deficient performance" is representation that "fell below an objective standard of reasonableness." *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011) (citing *Strickland*, 466 U.S. at 688). The movant must identify counsel's alleged acts or omissions that were not the result of reasonable, professional judgment considering the circumstances. *See Strickland*, 466 U.S. at 690; *see also United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995) (petitioner "bears the burden of establishing both components of an effectiveness inquiry" under *Strickland*). There is a strong presumption that counsel's performance fell within the wide range of professional assistance. *See Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689); *Bloom v. Calderon*, 132 F.3d 1267, 1270-71 (9th Cir. 1997). Judicial scrutiny of counsel's performance is highly deferential, *see Strickland*, 466 U.S. at 677-78, and "surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

To demonstrate prejudice, the petitioner bears the burden of demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 696; *Quintero-Barraza*, 78 F.3d at 1348. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *United States v. Leonti*, 326 F.3d 1111, 1120 (9th Cir. 2003).

### III.   Discussion and Analysis

Shults claims he received ineffective assistance of counsel at trial because his counsel: (1) did not allow Shults to testify; (2) failed to call two witnesses; (3) failed to properly question a witness; and (4) failed to obtain and call an expert witness. (Doc. 175 at 4-5, 7-8.) The Court addresses each ground in turn.

### A.    Counsel's failure to call Shults as a witness

Shults contends he was denied his right to effective assistance because his counsel failed to call him as a witness, despite Shults indicating before and during trial that he wanted to testify.[3] (Doc. 175 at 4.)

#### 1.    Shults waived his right to testify

A criminal defendant has a constitutional right to testify on his own behalf, as secured by the Fifth, Sixth, and Fourteenth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987); *see also United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) ("An accused's right to testify is a constitutional right of fundamental dimension."). Although the right is personal and can only be waived by the defendant, the waiver need not be explicit, and the Court has no duty to ensure an

---

[3] Shults also asserts that the Court did not ask him if he wanted to testify. (Doc. 175 at 4.) However, the Court has no such duty. *See United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999) ("The district court has no duty to affirmatively inform defendants of their right to testify, or to inquire whether they wish to exercise that right."); *see also United States v. Martinez*, 883 F.2d 750, 757 (9th Cir. 1989) ("It is primarily the responsibility of counsel, not the judge, to advise a defendant on whether or not to testify . . . [f]or the court to discuss the choice with the defendant would intrude into the attorney-client relationship protected by the sixth amendment.").

1   on-the-record waiver occurred. *Joelson*, 7 F.3d at 177; *United States v. Edwards*, 897 F.2d 445,

2   446 (9th Cir. 1990) (citing *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989), *vacated*

3   *on other grounds*). Because the defendant is "presumed to assent to his attorney's tactical

4   decision not to have him testify," a waiver "may be inferred from his failure to testify or notify

5   the court of his desire to do so." *Joelson*, 7 F.3d at 177. "When a defendant remains 'silent in the

6   face of his attorney's decision not to call him as a witness,' he waives the right to testify." *Id.*

7   (quoting *United States v. Nohara,* 3 F.3d 1239, 1244 (9th Cir. 1993)); *see also Martinez*, 883 F.2d

8   at 761 ("To hold that a defendant may abide by his lawyer's advice and not take the stand and

9   then invalidate the trial because he so acted is not fair to the government."). Rather, if the

10   defendant wishes to exercise his right to take the stand, he may reject his counsel's decision by

11   "insisting on testifying, speaking to the court, or discharging his lawyer." *Id.*; *United States v.*

12   *Pino-Noriega*, 189 F.3d 1089, 1095 (9th Cir. 1999).

13        Shults' only contention with respect to this claim is that he told his attorney he wanted to

14   testify but he was "not allowed to" or his requests were "ignored." (Doc. 175 at 4; Doc. 175-1 at

15   8.) There is no indication in the trial record that Shults made any attempt to express his

16   disagreement with counsels' decision not to call him as a witness, and Shults does not direct the

17   Court to any evidence otherwise. In fact, Shults does not challenge—and thereby concedes—that

18   he was advised by counsel of his right to testify, that he knew whether to testify was solely his

19   decision to make, and that he was silent on the issue at trial.

20        Moreover, the record supports a finding of waiver. First, it demonstrates that Shults was

21   aware of his rights, counsel actively engaged in discussions with Shults, and Shults understood

22   that the decision to testify was his to make. For example, on the third day of trial, counsel

23   represented to the Court that Shults' constitutional rights had been had previously discussed. (*See*

24   Doc. 125 at 4:2-7 [noting for the record that Shults' ongoing appeal "puts his Fifth Amendment

25   right to remain silent on his underlying case in conflict with his rights here."].) The same day,

26   counsel met at sidebar and Shults' presence was waived. (Doc. 125 at 114:20-25, 115:1.) When

27   the Court asked whether a decision had been made as to Shults' desire to testify, counsel

28   responded that they needed to "spend some time with [Shults] to come to that election." (*Id.* at

118:13-16.) The Court instructed counsel to return the following morning and "[d]o whatever you need to do, whether it be the witnesses you are talking about, and the defendant or not the defendant," which counsel acknowledged. (*Id.* at 119:8-11.) At the end of day three, the Court and counsel engaged in the following discussion:

> THE COURT: All right. Let the record reflect the jury has left. How many more witnesses do you have?
>
> MS. SNIDER: Your Honor, if memory serves, we have five witnesses for tomorrow. And then *if Mr. Shults chooses to testify*, he would testify tomorrow as well.
>
> THE COURT: You will have a decision by tomorrow morning?
>
> MR. CARBAJAL: We have got a list of seven.
>
> MS. SNIDER: I'm sorry. Seven witnesses that are scheduled to come tomorrow, and then *if Mr. Shults chooses to testify*, and we should have an answer tomorrow morning.
>
> THE COURT: Okay. The reason I'm asking that question is I don't want there to have to be a break for you to go discuss it with your client. That needs to be done.
>
> MR. LEE: *We have asked the Marshals to take Mr. Shults down to the lockup now so we can start the conversation.*

(*Id.* at 219:13-25, 220:1-5 [emphasis added].) The next morning, counsel informed the Court that they had made a "preliminary decision" as to Shults testifying but wanted "to see the rest of the witnesses before [making] a final decision." (Doc. 126 at 3:14-18.) When asked by the Court what the preliminary decision was, counsel replied, "We are leaning against not." (*Id.* at 3:19-20.) Shults was present for this exchange and said nothing. (*See id.* at 3:5-6, 3:21-23.)

Additionally, Shults was not ignorant of his constitutional rights or criminal trial procedure. He was present at two hearings prior to the trial in this matter, where his right to testify at trial was discussed at length, which pertained to the issues presented where Shults exercised his right to remain silent in his underlying case but wished to testify in the instant matter. (*See, e.g.*, Doc. 43 at 10:14-15 [counsel stating that Shults "has the right, obviously, to testify in his own defense at this particular trial."]; *id.* at 11:6-9 [counsel explaining that if Shults received a new trial in the underlying case, it would "put[] his constitutional right in this case to take the stand in his own defense at odds with his right to remain silent in the other case"]; Doc.

54 at 8:8-9 [counsel indicating the defense planned to call Shults to testify]; *id*. at 14:13-17 [counsel asserting that "obviously a defendant's right to testify at a trial is his absolute right. And we just are taking -- I guess this may be minuscule, but the Court can't compel Mr. Shults' testimony obviously. He has to make that election."); *id*. at 17:2-9 [counsel clarifying the defense's position by stating, "[W]e certainly will speak to Mr. Shults and give him our best legal advice. We think he is going to be placed in one of two positions: *Either he will not testify in this case, when defense counsel believes he should*; or alternatively, . . . we will have to craft his testimony in a manner that will not allow him to put on the full defense that we wish to."] [emphasis added].) Relatedly, Shults' experience as a defendant in a prior criminal trial further supports a finding of waiver. *See Parke v. Raley,* 506 U.S. 20, 37 (1992) (citing cases in noting that the Supreme Court had "previously treated evidence of a defendant's prior experience with the criminal justice system as relevant to the question whether he knowingly waived constitutional rights").

Finally, Shults does not direct the Court to any evidence in the record to support his position, and he does not proffer any facts or otherwise acknowledge the government's thorough compilation of evidence refuting his claims. (*See* Docs. 175, 191.) Shults "cannot in hindsight claim he was deprived of his right to testify . . . without any evidence in the record to support his contention." *Gudino v. Madden*, 2023 WL 3063826, at *24 (C.D. Cal. Feb. 27, 2023), *report and recommendation adopted*, 2023 WL 3059860 (C.D. Cal. Apr. 24, 2023); *see also Hawley v. McEwen*, 2015 WL 5440677, at *10 (N.D. Cal. Sept. 15, 2015) (explaining that where the trial record is "bereft of any evidence even hinting" a movant's efforts to fire counsel, address the Court, or otherwise express a desire to testify, and the movant remains silent in the face of counsel's decision not to call him to testify, his claim fails). In sum, the record demonstrates that Shults knew he had a right to testify and that it was his decision whether he would do so, yet he was silent when counsel announced the decision not to call him as a witness. Therefore, Shults knowingly waived his right to testify. *Edward*s, 897 F.2d at 447; *Nohara*, 3 F.3d at 1244. Additionally, by waiving that right, Shults also waived any claim of ineffective assistance of counsel. *See Nohara*, 3 F.3d at 1243 (citing *Edwards*, 897 F.2d at 446-47, in finding movant

1    waived his right to testify by remaining silent at trial, which precluded any argument that he was

2    denied his right to effective assistance of counsel); *see also Ramirez v. Yates*, 2012 WL 2050430,

3    at *25 (E.D. Cal. June 6, 2012), *subsequently aff'd*, 548 F. App'x 447 (9th Cir. 2013) (finding

4    movant failed to show entitlement to federal habeas relief on ineffective assistance of counsel

5    claim where he remained silent at trial with respect to his request to testify); *Gudino*, 2023 WL

6    3063826, at *25 (holding waiver of the right to testify also waives right to claim ineffective

7    assistance of counsel); *Karkehabadi v. Tampkins*, 2019 WL 3849175, at *10 (C.D. Cal. May 24,

8    2019), *report and recommendation adopted*, 2019 WL 3841791 (C.D. Cal. Aug. 15, 2019)

9    (same); *Hawley*, 2015 WL 5440677, at *10 (same); *United States v. Lopez*, 2007 WL 1456138, at

10   *7 (E.D. Cal. May 16, 2007), *report and recommendation adopted*, 2007 WL 2012795 (E.D. Cal.

11   July 6, 2007) (same).

12                    2.      Shults fails to demonstrate prejudice

13          Even assuming the attorneys' conduct in not calling the defendant to testify constitutes

14   deficient performance, Shults has not shown he suffered prejudiced as a result. *See Strickland*,

15   466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to

16   approach the inquiry in the same order or even to address both components of the inquiry if the

17   defendant makes an insufficient showing on one.").  "An error by counsel, even if professionally

18   unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error

19   had no effect on the judgment." *Strickland*, 466 U.S. at 691 (1984). Thus, "any deficiencies in

20   counsel's performance must be prejudicial to the defense in order to constitute ineffective

21   assistance under the Constitution." *Id*. at 692. To demonstrate prejudice, the movant must show

22   that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

23   the proceeding would have been different." *Id*. at 694. "It is not enough 'to show that the errors

24   had some conceivable effect on the outcome of the proceeding.'" *Harrington*, 562 U.S. at 104

25   (quoting *Strickland*, 466 U.S. at 693). A "reasonable probability" is "a probability sufficient to

26   undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Leonti*, 326 F.3d at 1120.

27          Shults asserts he was prejudiced by counsel's error because "there is a reasonable

28   probability the outcome of the trial would have been different had [he] testified." Shults contends

1   that the trial "largely turned on the credibility of the witnesses" and his testimony "would have

2   provided clarity about his intent in making the statements the jury found were unlawful." (Doc.

3   175-1 at 8.) Shults claims he would have testified the following: (1) that he meant no harm to

4   Judge Guilford; (2) that the statements he made were pressured out of him by Knox, who

5   "essentially fed Shults what [Knox] wanted to hear"; (3) that he wanted Knox to hire an attorney

6   for him and was afraid for his safety, so he "went along" with Knox; and (4) that the statements

7   he made came from various books, including, "The Camel Club, The Collectors, Stone Cold,

8   Divine Justice, Hell's Corner, Bullseye, The Racketeer[,] and titles from the Jason Bourne

9   series." (Doc. 175 at 4.) Critically, Shults does not explain how his proposed testimony would

10  have had more than a conceivable effect on the trial's outcome.[4] *Strickland*, 466 U.S. at 693

11  (holding that the effect on the outcome of a proceeding cannot be "conceivable" because

12  "virtually every act or omission of counsel would meet that test"); *see also Ramirez*, 2012 WL

13  2050430, at *11 ("The prejudice prong requires a showing that the likelihood of a different result

14  was substantial, not just conceivable.") (citing *Richter*, 562 U.S. at 112). Even so, the record does

15  not support a finding of prejudice.

16          First, the jury heard testimony and argument regarding Shults' expansive book collection,

17  affinity for reading, and tendency to take on a book's character or otherwise take on others'

18  stories. (*See, e.g.*, Doc. 125 at 60:18-19; 61:18-20, 62:1-14; 64:19-23; 65:16-20; Doc. 126 at

19  52:25, 53:1-4; 100:7-9; 103:22-23; 105:14-16.) Thus, Shults' proposed testimony would have

20  duplicated that already presented at trial. *See Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir.

21  2009) (no showing of prejudice where proposed testimony was "most likely" cumulative of

22  evidence already presented); *see also Karkehabadi*, 2019 WL 3849175, at *11 ("Petitioner's

23  testimony would be duplicative of other evidence presented at trial and consistent with the

24  prosecution's case as presented to the jury. It remains unclear how Petitioner's repetition of this

25  already admitted evidence through his personal testimony would have had any effect on the

26  outcome of the trial."); *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984) (no

27
28  [4] In addition to the deficiencies noted *supra*, Shults offers only conclusory allegations and arguments that are unsupported by facts, argument, or evidence in the record. This also weighs against a finding in Shults' favor. *Borg*, 24 F.3d at 26; *Neighbors*, 457 F.2d at 795.

showing of *Strickland* prejudice for failure to present cumulative evidence through additional witness testimony).

Recently, the Ninth Circuit noted that where prior decisions have "found the omission of cumulative evidence prejudicial, the evidence has been so persuasive that it would have meaningfully altered the jury's view of the case." *Staten v. Davis*, 962 F.3d 487, 498 (9th Cir. 2020) (citing cases). The Court found no showing of prejudice because although the omitted testimony could have "bolstered the existing defense theory, … it was not a new theory that the jury never heard, … and would not have significantly changed the nature of the defense" or "changed the light in which the jury viewed" the prosecution's evidence. *Id*. at 498-99. In any event, Shults fails to explain how providing the titles of various books from which his statements came would be sufficient to undermine confidence in the trial's outcome. *Strickland*, 466 U.S. at 694; *Leonti*, 326 F.3d at 1120.

Second, Shults' counsel advanced the theory that Shults had a propensity to embellish and take on other people's stories, that inmates who cooperate for the government are potentially incredible as they will do nearly anything for a sentence reduction, and that, consequently, Knox set Shults up in exchange for a benefit. The jury was aware of this theory, as it was testified to by various witnesses and argued by both counsel and the government. (*See*, *e.g*., Doc. 124 at 163:22-25, 164:1-25; 165:1-7; Doc. 125 at 66:4-8; 68:17-25, 69:1-9; 134:25, 135:1-2; Doc. 126 at 84:3-6; 98:7-21; 101:5-7, 101:12-19; 109:9-12; 111:16-25; 112:1-3; 113:3-6, 113:14-25; 114:1-2.) This weighs against a finding of prejudice. *See United States v. Ailemen*, 710 F. Supp. 2d 960, 970 (N.D. Cal. 2008), *aff'd*, 473 F. App'x 754 (9th Cir. 2012) (finding no reasonable probability of a different outcome where counsel, albeit not petitioner, advanced the arguments petitioner wished to make and thus, the jury was aware of petitioner's theory and could weigh the theory as rational fact finders).

Finally, Shults does not explain how attempting to bolster his credibility by testifying would have had a substantial effect on the trial's outcome in light of the theory under which counsel proceeded. *Ramirez*, 2012 WL 2050430, at *11. In other words, Shults' counsel made a significant effort to demonstrate that Shults had a tendency to be untruthful, yet Shults maintains

13

that had he taken the stand, the jury would have found him to be believable. Notably, the

evidence against him, including his underlying fraud conviction, would have undermined any

testimony he offered and would have weakened his case further. *See Karkehabadi*, 2019 WL

3849175, at *12 ("Petitioner does not articulate why there is a reasonable probability the jury

would have believed him over the voluminous contravening evidence."); *see also Ailemen*, 710 F.

Supp. at 970 (finding petitioner's proposed testimony "likely would have weakened his defense

as otherwise inadmissible evidence adverse to petitioner would likely have been presented in

cross-examination"). Accordingly, Shults has not demonstrated, on the factual record available to

the Court, that he was prejudiced by being denied his right to testify.

### 3.      Shults' right to autonomy claim fails

Shults also asserts his counsel's failure to call him as a witness violated his Sixth

Amendment right to autonomy as provided by *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018). (*See*

Doc. 175-1 at 7-9.) On its face, Shults' motion distinguishes his autonomy claim from his

ineffective assistance claim. (*See id*. at 8-9 [indicating that counsel was ineffective for failing to

call Shults to testify *and* that his right to autonomy was violated by counsel's failure to call him,

the latter of which was structural error and not governed by *Strickland*].) However, as explained

below, it appears Shults' autonomy claim is, in fact, couched in his ineffective assistance claim,

which is likewise the only approach that would permit consideration of the claim's merits. Even

still, the outcome is unchanged.

#### a.      Procedural default

The government contends Shults procedurally defaulted on his right to autonomy claim.

(Doc. 187 at 29-31.) Ineffective assistance of counsel claims may be raised for the first time on

collateral review, *Massaro*, 538 U.S. at 504, but a § 2255 movant procedurally defaults on claims

he failed to raise on direct appeal unless he can show cause and prejudice or actual innocence.

*United States v. Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003) (citing *Bousley v. United States*, 523

U.S. 614, 622 (1998)). Shults does not challenge that he failed to raise the issue of structural error

on direct appeal. However, as previously mentioned, it is not clear whether he brings the claim

separately from his ineffective assistance of counsel claim. (*See* Doc. 175-1 at 7-9 [asserting the

1   violation of his right to testify was structural error, and thus, not governed by *Strickland*].)

2           To the extent Shults brings a separate claim for violation of his constitutional right to

3   autonomy, he fails to show prejudice, as discussed *supra*, and does not argue actual innocence. In

4   fact, he fails to address the issue of procedural default entirely. On the other hand, the case law

5   relied on by Shults and discussed by the government suggest that Shults raises his autonomy

6   claim via an ineffective assistance of counsel claim as opposed to a distinct claim that would

7   require a showing of cause and prejudice or actual innocence. That Shults does not assert

8   otherwise or offer any argument showing cause and prejudice or actual innocence sufficient to

9   overcome default, also supports this finding. To find otherwise would suggest that Shults

10  intended to bring a separate autonomy claim based on structural error despite no attempt to avoid

11  procedural default at the outset. Thus, the Court will, for purposes of this discussion, presume

12  Shults did not procedurally default on his autonomy claim because he intended to assert it by way

13  of his ineffective assistance claim.

14          Notwithstanding, Shults' claim fails, for when a claim of structural error is first asserted in

15  the context of an ineffective assistance of counsel claim on collateral review, the defendant must

16  still prove prejudice under *Strickland*.

17                      b.      *Structural error*

18          Shults argues that the violation of his right to autonomy was "structural error"[5] and

19  *Strickland* does not apply, that is, prejudice is presumed. (*See* Doc. 175 at 4, Doc. 175-1 at 8-9.)

20  However, even assuming such a violation amounts to structural error, *Strickland* is the standard

21  under which courts are to consider such claims. *See Beatriz Govea v. United States*, 2019 WL

22  1491958, at *3 (S.D. Cal. Apr. 4, 2019) (citing *Weaver v. Massachusetts*, 582 U.S. 286, 298-301,

23

24  ───────────────
    [5] Structural errors are errors that affect "the framework within which the trial proceeds, rather than simply
25  an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). While certain
    structural errors require automatic reversal, they are "neither common nor numerous." *United States v.
26  Kleinman*, 880 F.3d 1020, 1033 (9th Cir. 2017) (citing *Neder v. United States*, 527 U.S. 1, 8 (1999)); *see
    also Jones v. Neuschmid*, 2021 WL 1056597, at *30-31 (N.D. Cal. Mar. 18, 2021) (collecting cases and
27  listing examples). Moreover, the timing of a structural error claim may affect whether automatic reversal is
    required. *See Weaver v. Massachusetts*, 582 U.S. 286, 302, 137 S. Ct. 1899, 1912 (2017) (structural errors
28  not raised on direct review but instead collaterally via ineffective assistance of counsel claims not
    necessarily subject to automatic reversal).

                                              15

1    137 S. Ct. 1899, 1910-11 (2017)).

2    In advancing his position, Shults relies on *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018)

3    and *Williams v. United States*, 2018 WL 4656231 (D. Conn. Sept. 27, 2018). (*See* Doc. 175-1 at

4    7-9.) In *McCoy*, despite petitioner McCoy's clear and adamant objections, his trial counsel

5    conceded to the jury that McCoy had committed triple homicide, instead focusing the defense on

6    McCoy lacking the specific intent necessary for a first-degree murder conviction. 138 S. Ct. at

7    1503. The jury found McCoy guilty on all counts. *Id*. Upon moving for a new trial, the Louisiana

8    Supreme Court affirmed the trial court's ruling that counsel had the authority to concede guilt

9    despite McCoy's objections. *Id*. The United States Supreme Court granted certiorari and reversed,

10   holding that even when such a decision is made based on a reasonable assessment that it would

11   offer a defendant the best chance of avoiding the death penalty, the Sixth Amendment guarantees

12   a criminal defendant autonomy to choose the objective of his defense, including to maintain his

13   innocence, the express assertion of which cannot be overridden by counsel. *Id*. at 1507-09. The

14   Court explained that a defendant's insistence on maintaining his innocence at the guilt phase of a

15   capital trial is "not [a] strategic choice[] about how best to *achieve* a client's objectives," but

16   rather "what the client's objectives in fact *are*." *Id*. at 1508 (emphasis in original). Accordingly,

17   the Court concluded that "counsel's admission of a client's guilt over the client's express

18   objection" is structural error, necessitating a new trial "without any need first to show prejudice."

19   *Id*. at 1504, 1511.

20   Notably, the Court distinguished its earlier decision in *Florida v. Nixon*, 543 U.S. 175

21   (2004), where the petitioner "'was generally unresponsive'" during discussions of trial strategy,

22   and 'never verbally approved or protested' counsel's proposed approach." *See id*. at 1505, 1509

23   (quoting *Nixon*). In *Nixon*, the Court concluded that in such circumstances, counsel is "not

24   automatically barred" from conceding guilt and that the Florida Supreme Court erred in

25   presuming both deficient performance and prejudice. 543 U.S. at 178-79. "Instead, if counsel's

26   strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard,

27   that is the end of the matter; no tenable claim of ineffective assistance would remain." *Id*. at 192.

28   The facts at hand are more akin to *Nixon*. As previously discussed, there is no indication

that Shults objected to his counsel's trial strategy—if not that Shults himself made the decision—not to call him as a witness. Furthermore, the Supreme Court did not resolve whether the violation of a defendant's right to testify ranks as structural error in rendering its decision in *McCoy*, which brings the Court to the second case Shults cites.

Turning to *Williams*, Shults' reliance is equally misplaced. There, the Connecticut district court explicitly rejected the argument Shults advances. 2018 WL 4656231, at **3-5 (petitioner asserting the violation of right to testify was structural error requiring reversal without a showing of prejudice). The petitioner analogized his right to testify with the right to decide whether to concede guilt as recognized in *McCoy*, arguing that his "right to testify similarly implicates a defendant's right to decide the way in which he will defend himself." *Id.*, at *4. While the court agreed that the violation of a defendant's right to testify was *likely* a structural error, it noted that neither the Supreme Court[6] nor the Second Circuit had deemed it as such, and in fact, binding Second Circuit precedent directs courts to consider such claims under *Strickland*. *Id.*, at *5.[7]

---

[6] This clarification was in reference to *McCoy* and *Weaver*, the latter of which the court summarized as follows:

> In *Weaver v. Massachusetts*, the Supreme Court explained that it has deemed certain errors structural and required reversal "because they cause fundamental unfairness, either to the defendant in the specific case or by pervasive undermining of the systemic requirements of a fair and open judicial process." 137 S. Ct. 1899, 1911 (2017). The Court acknowledged that there is disagreement among circuit and district courts "about whether a defendant must demonstrate prejudice in a case like this one—in which a structural error is neither preserved nor raised on direct review but is raised later via a claim alleging ineffective assistance of counsel." *Id.* at 1907. The *Weaver* Court explained that the differences between direct and collateral review "justify a different standard for evaluating a structural error." *Id.* at 1912. Thus, even if an error is deemed structural requiring automatic reversal on direct review, the same may not be required on collateral review.

> The Court went on to resolve the disagreement "specifically and only in the context of trial counsel's failure to object to the closure of the courtroom during jury selection," *id.*, finding that, in such a case, "*Strickland* prejudice is not shown automatically." *Id.* at 1911. "Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or ... to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id.*

*Williams*, 2018 WL 4656231, at **4-5.

[7] As the government accurately notes,

> *McCoy* and *Weaver* do not suggest that Shults's "autonomy" claim is immune from *Strickland* analysis. Instead, these cases demonstrate that (1) where defendant has failed to raise a structural claim on direct review, *Strickland* applies; *See Weaver,* 137 S.Ct. at 1912-1913; and (2) where a defendant neither "consents nor objects" to his attorney's

17

1   Accordingly, the court applied *Strickland*. *See id*., at **6-9.

2   As recognized in *Williams*, the Court does not conclusively reject that the violation of

3   Shults' right to testify was structural error. Rather, "binding Ninth Circuit authority applies the

4   *Strickland* standard to a claim that an attorney provided ineffective assistance by dissuading a

5   defendant from testifying." *Karkehabadi*, 2019 WL 3849175, at *9 (citing *Medley v. Runnels*,

6   506 F.3d 857, 861 (9th Cir. 2007)); *see also Carter v. Davis*, 946 F.3d 489, 509-12 (9th Cir.

7   2019) (applying *Strickland* post-*Weaver* in analyzing § 2254 denial where petitioner claimed he

8   was denied right to testify). Other district courts within the Ninth Circuit have followed suit. For

9   example, the petitioner in *Riedel v. McDonald*, 2018 WL 5816238 (C.D. Cal. Sept. 24, 2018),

10  argued his counsel was ineffective in advising him not to testify, which resulted in a structural

11  error requiring reversal irrespective of prejudice. *Id*., at *6. Even assuming that the denial of the

12  right to testify constitutes structural error, the court applied *Strickland*, making clear that "there is

13  no controlling authority standing for the proposition that prejudice is presumed" where a

14  petitioner claims ineffective assistance of counsel by advising against testifying. *See id*., at **7-9.

15  Similarly, though the court's reasoning in *United States v. Smith*, 2020 WL 1666637 (E.D.

16  Wash. Apr. 3, 2020), differed from that in *Riedel*, it reached the same conclusion. This is

17  noteworthy because Shults' argument fails under either case. In *Smith*, the petitioner did not

18  testify and subsequently claimed his counsel violated his right to autonomy. *Id*., at *2. Because

19  the petitioner failed to direct the court to "a single case that incorporates [the right to present a

20  defense] into *McCoy*'s autonomy analysis," the alleged error was reviewed under *Strickland*. *Id*.,

21  at *6; *see also Dickinson v. Shinn*, 2020 WL 587850, at *8 (D. Ariz. Feb. 6, 2020), *aff'd*, 2 F.4th

22  851 (9th Cir. 2021) (holding that though *Weaver* confined its holding to public trial violations, a

23  showing of prejudice was still required where petitioner raised, for the first time on collateral

24  review, an ineffective assistance claim of structural error); *McKay-Erskine v. Uttecht*, 2019 WL

25  1505933, at *1 (W.D. Wash. Apr. 5, 2019) (finding state court's denial of § 2254 petition not

26

27   decision, there can be no structural error. *McCoy*, 138 S.Ct. at 1505, 1509 (quoting *Nixon*,
     543 at 178).

28  (Doc. 187 at 26.)

objectively unreasonable where petitioner failed to show he was prejudiced by counsel's failure to call him to testify and failed to identify any evidence or present any argument on the issue of prejudice"); *Beatriz Govea*, 2019 WL 1491958, at *3 (applying *Strickland* to IAC claim of structural error where petitioner claimed her counsel inadequately prepared her to testify); *Duncan v. United States*, 2019 WL 1320039, at *9 (D. Idaho Mar. 22, 2019) (distinguishing "objections to structural errors made at trial and preserved on direct appeal (in which case prejudice is presumed) and where … objections to structural errors are raised later in the context of an ineffective assistance of counsel claim (in which case the burden is on defendant to show prejudice)") (citing *Weaver*, 137 S.Ct. at 1909-11).

Shults directs the Court to no legal authority standing for the proposition that such a violation is structural error or that such an error, first raised on collateral review by way of an ineffective assistance claim, is exempt from the *Strickland* analysis. Thus, the Court follows this Circuit's precedent in requiring the application of *Strickland.* In so doing, as established *supra*, Shults fails to demonstrate prejudice under *Strickland* and accordingly, his right to autonomy claim also fails.

**B.     Grounds Two, Three, and Four: Failure to call additional witnesses and failure to properly question a witness**

Shults' remaining grounds for relief pertain to his counsel's ineffective assistance in questioning witnesses. (*See* Doc. 175-1 at 9-10.) First, Shults claims his counsel "did not call Victor Torrez (spelling unsure) and another inmate from the Taft prison." (*Id*. at 9.) He asserts these inmates would have testified "about how Bill Knox told them that he was trying to set up Shults so he could obtain a sentence reduction under Fed. R. Crim. P. 35." (*Id*.) Due to this failure, Shults asserts he was prejudiced because the inmates' testimony, in combination with his own, "would have been enough to create a reasonable doubt in the jury's mind." (*Id*.; Doc. 175 at 5.)

Similarly, he asserts his counsel failed to "properly question" witness Anwar Assan[8]

---

[8] The parties spell this witness's last name "Assan" and "Hassan." (*See* Doc. 175-1 at 10; Doc. 187 at 23, 43.) However, reference to the docket indicates the correct spelling is "Assan." (*See* Docs. 69, 96, 126.)

1  because, although Mr. Assan was called to testify, Shults' counsel "did not ask Shults [sic][9] the

2  key question—whether Knox told [Assan] that he was trying to set up Shults for a Rule 35

3  sentence reduction." (Doc. 175-1 at 10.) Shults avers that Mr. Assan's response would have been

4  that Knox told him he was trying to set Shults up. (*Id*.) Without explanation, Shults contends this

5  testimony was "critical" because had the question been asked, there would have been a reasonable

6  probability of the jury rendering a not guilty verdict. (Doc. 175 at 7.)

7        Finally, Shults claims his counsel was ineffective because he failed to obtain and call an

8  expert witness familiar with prison administration. (Doc. 175-1 at 10.) Specifically, he asserts his

9  counsel "could have called Joe Gunja, a former BOP Warden and Regional Director who would

10  have testified about how prison inmates will oftentimes falsely accuse other inmates of criminal

11  wrongdoing in order to obtain a sentence reduction." (*Id*.) He claims Mr. Gunja "could have

12  clarified for the jury the extent inmates will sometimes go to create such falsehoods by drawing

13  on his decades of experience in corrections and having seem [*sic*] similar such schemes be

14  perpetrated in the past." (*Id*.) Accordingly, Shults contends this proposed testimony would have

15  "helped the jury better weigh the credibility of Knox's testimony." (*Id*. at 11.) However, for

16  largely the same reasons as above, Shults also fails to prove he received ineffective assistance of

17  counsel on these grounds.

18                 1.    Speculation is insufficient

19        As an initial matter, all three asserted grounds for relief assume that the witnesses would

20  have, in fact, been willing to testify in the manner Shults describes. However, "complaints based

21  upon uncalled witnesses are not favored in habeas corpus petitions 'because the presentation of

22  witness testimony is essentially strategic and thus within trial counsel's domain, and that

23  speculations as to what these witnesses would have testified is too uncertain.'" *Preciado v.*

24  *Munez*, 2017 WL 11633163, at *6 (C.D. Cal. Dec. 22, 2017), *report and recommendation*

25  *adopted*, 2018 WL 11354978 (C.D. Cal. Feb. 12, 2018), *aff'd*, 779 F. App'x 493 (9th Cir. 2019)

---

26  [9] As written, Shults asserts his counsel "did not ask Shults the key question . . .." (Doc. 175-1 at 10.)

27  However, based on the context of Shults' argument, this appears to be a typographical error. (*See id.*
[asserting next that had his counsel asked Assan the "key question . . . Assan would have answered that

28  Knox told him he was trying to set up Shults."].) Thus, the Court presumes Shults intended his assertion to
refer to Mr. Assan.

(quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). Thus, without substantiating evidence, such as an affidavit from the witnesses, Shults fails to show how their testimonies would assist the defense. *See Dickey v. Davis*, 231 F. Supp. 3d 634, 702 (E.D. Cal. 2017), *aff'd sub nom. Colin Dickey v. Ron Davis*, 19-99009 (Oct. 29, 2019) ("Speculation that [a] missing witness[ ] would have been helpful ... is insufficient to carry the burden of a habeas corpus petitioner."); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) ("Dows provides no evidence that this witness would have provided helpful testimony for the defense-i.e., Dows has not presented an affidavit from this alleged witness."); *Neely v. Pressley*, 2017 WL 700083, at *2 (C.D. Cal. Feb. 22, 2017) ("Without evidence as to what witnesses would have testified to at trial, a habeas petitioner cannot establish *Strickland* prejudice for failing to call trial witnesses.").

### 2.   Shults does not overcome the presumption of reasonable judgment

Shults also fails to consider that given the testimony that was elicited by counsel at trial, it appears counsel made a reasonable tactical decision not to call additional witnesses or ask Mr. Assan an additional question. It is well settled that trial counsel is entitled to a strong presumption of reasonableness. As the Supreme Court in *Strickland* explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [citation]. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689; *see also Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."); *Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980) ("[T]he decision whether to subpoena certain witnesses rests upon the sound professional judgment of the trial lawyer.");

1    *Cullen v. Pinholster,* 563 U.S. 170, 196 (2011) (explaining that "*Strickland* specifically

2    commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant

3    decisions in the exercise of reasonable professional judgment'"). Given this presumption, "a

4    habeas petitioner claiming ineffective assistance 'bears the heavy burden of proving that

5    counsel's assistance was neither reasonable nor the result of sound trial strategy.'" *Sanchez v.*

6    *Neuschmid,* 2021 WL 1192001, at *11 (C.D. Cal. Feb. 17, 2021), *certificate of appealability*

7    *denied sub nom. Sanchez v. Neuschmid*, 2022 WL 17075055 (9th Cir. July 25, 2022) (quoting

8    *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001)). Thus, "[m]ere criticism of a trial

9    tactic is not sufficient to support a charge of ineffective representation." *United States v.*

10   *Ferreira-Alameda*, 815 F.2d 1251, 1254 (9th Cir. 1986). Without appreciating the testimony that

11   *was* elicited or supporting his assertion with any substantive argument, Shults plainly criticizes

12   counsel's alleged errors as "not strategic." (*See* Doc. 175 at 5; Doc. 175-1 at 9; *see also* Doc. 175

13   at 7 [asserting "there was no strategic reason for not asking [Mr. Assan] the question"].) This is

14   insufficient to overcome the presumption of reasonableness.

15       In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court clarified that *Strickland*

16   "permits counsel to make a reasonable decision that makes particular investigations unnecessary."

17   *Id*. at 106 (internal quotation marks omitted). In other words, counsel was entitled to "balance

18   limited resources in accord with effective trial tactics and strategies." *Id.* at 107. *Strickland* does

19   not "guarantee perfect representation, only a reasonably competent attorney." *Id.* at 110 (internal

20   quotation marks omitted). "Representation is constitutionally ineffective only if it 'so undermined

21   the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Id.*

22   (quoting *Strickland*, 466 U.S. at 686). Shults does not contend his counsel failed to interview the

23   uncalled witnesses or investigate the benefit of their potential testimonies. In any event, based on

24   the testimony that was elicited, it appears from the record that counsel's decisions were strategic

25   because the additional evidence would likely have been cumulative.

26                3.    The proposed testimony is cumulative

27       In presenting the defense, Shults' counsel called sixteen witnesses, including eleven

28   inmates, two correctional officers, two employees of the United States Marshals Service, and a

1   former United States Air Force pararescueman. Though counsel focused on Shults' tendency to

2   embellish, comparable emphasis was placed on the theory that inmates, including Knox, will do

3   nearly anything for a sentence reduction.

*a.       Inmate testimony*

5          The testimony Shults claims should have been offered by Mr. Assan, Mr. Torrez, and an

6   unnamed inmate, was that Knox told each witness he was trying to set Shults up so Knox could

7   obtain a Rule 35 sentence reduction.[10] However, counsel sufficiently raised this theory before the

8   jury through argument and witness examination.

9          Counsel's examination of Knox was centered on substantiating the defense's position,

10  which included portraying Knox as incredible. For example, Knox was questioned on his

11  familiarity with Rule 35 motions; his motivations for cooperating with the government, including

12  hopes of a sentence reduction; other "tips" he provided to the government, which never

13  materialized; the nature of his relationship with Shults; the nature of his relationship and

14  familiarity with federal judges, including Judge Guilford; the lies he told, including lying to his

15  daughter about his reduction offer being in writing, and lying to business partners about his

16  assets; the similarities between his case and Shults' underlying case; and the extent to which he

17  organized the meeting with Shults and fed Shults the statements he made. (*See* Doc. 125 at 104-

18  188, 211-217.) Notably, Knox never denied his motivations for cooperating with the government.

19  (*See id*. at 133-34, 139-142, 145, 151-52.) In fact, he testified that on December 11, 2016, at 7:45

---

[10] Shults does not clarify what he means by being "set up" by Knox. For example, he does not indicate that Knox provided him with the information that he then repeated, that Knox controlled the conversation by provoking Shults to respond in a certain way, that Knox capitalized on his friendship with Shults, or that Knox simply arranged the meeting. First, as explained *infra*, both counsel and the government addressed whether Knox provided Shults with the information he repeated. Second, it is undisputed that Knox cooperated with the government for a sentence reduction by arranging a meeting to record Shults surreptitiously when he made his threats against Judge Guilford. To achieve this objective, Knox necessarily coordinated a time and raised the topic while wearing the wire. Furthermore, to the extent Shults defines a setup as Knox asking him specific questions to provoke potentially incriminating responses, Knox concedes this. (*See* Doc. 125 at 212:2-6 ["I said, 'Is it' – 'Do you hate your judge, right?' I remember I said something, 'Is it one of these things where you just hate your judge,'…"]; *see also id*. at 213:17-25.) Finally, to the extent he defines a setup as Knox taking advantage of their friendship and what Knox could offer him, the government quoted a recording of Shults from November 2017, where he said, "Actually, the guy I was talking to was trying to say he was going to hire a divorce lawyer for me, so you know, I was baited into the situation." (Doc. 126 at 113:23-25.) Thus, from any angle, the jury was aware of the defense's theory that Knox "set up" Shults.

a.m., he met Shults in a private location for a "pre-planned meeting" and had the recording device with him, which he obtained from a correctional officer that morning. (*See id*. at 134:8-12, 202:10-25, 203:1-11.) He also indicated that during the meeting, he "tried to limit" himself to three questions. (*Id*. at 134:15-17.) When asked whether he believed Shults went surfing with Google CEO Eric Schmidt, Knox replied, "I didn't really care. I'm not a surfer, and I didn't think that his comment was germane to, you know, the three things I wanted to obtain that day. So I could care less who he knows." (*Id*. at 135:25, 136:1-9.)

During closing argument, counsel made the defense's theory clear: "We also, for context purposes, have to look at what this recording is and who made it. We know that. Bill Knox made this to set up Craig Shults. He made it to get time off his sentence. This was an ongoing setup." (Doc. 126 at 101:4-7.) Counsel also asserted that upon allegedly hearing the threat, Knox did not disassociate himself, but rather arranged a meeting where there would be no other witnesses, "where he [could] control the conversation, where he [could] control the flow of information." (*Id*. at 101:12-17.) The argument continued, "So these things on the recording you are hearing, they also happened to another individual. And, again, we have heard time and time again that Craig Shults would adopt other people's stories." (*Id*. at 105:13-16.) Counsel asserted that Knox saw Shults as "an easy mark … someone who he knew he could manipulate. He saw someone who he knew, if you fed him a story, he would spit it back out. Someone he could mold." (*Id*. at 109:9-12.) Counsel argued that Shults did not acquire the personal information about Judge Guilford, but rather that the information came from Knox. (*See id*. at 111:1-6.)

Finally, former inmate Julio Caro testified that Knox said he "somehow organized" to confidentially record Shults, that he made two attempts before successfully doing so, and that it was "really hard to get [Shults] to go" to their second meeting. (Doc. 126 at 32:12-15, 32:20-23.) Mr. Caro further testified that recording Shults "was going to give [Knox] a benefit on his case." (*Id*. at 33:7-12.) Thus, just as with his own testimony, the testimony Shults proposes by way of these inmate witnesses would duplicate that already presented at trial. Thus, Shults fails to demonstrate he was prejudiced by counsel's failure to introduce cumulative evidence. *See Staten*, 962 F.3d at 498 ("When [the Ninth Circuit has] found the omission of cumulative evidence

1   prejudicial, the evidence has been so persuasive that it would have meaningfully altered the jury's

2   view of the case."); *see also Matylinsky*, 577 F.3d at 1097 (no showing of prejudice where

3   proposed testimony was "most likely" cumulative of evidence already presented); *see also*

4   *Schaflander*, 743 F.2d at 718 (no showing of *Strickland* prejudice for failure to present

5   cumulative evidence through additional witness testimony); *Chapman v. Lampert*, 371 F. App'x

6   742, 745 (9th Cir. 2010) (finding cumulative impeachment evidence was not strong enough to

7   undermine confidence in the trial's outcome).

8                                  *b.      Expert testimony*

9          Shults fares no better in asserting the proposed expert testimony was "critical" in

10  providing factual clarity to the jury. (Doc. 175 at 8.) He claims Mr. Gunja would have testified

11  "that it is common for inmates in federal prison to lie and do practically anything to try and obtain

12  a sentence reduction." (*Id.*) Assuming that this would have been Mr. Gunja's testimony and that

13  the testimony would have been admissible, the trial record indicates that this notion was

14  sufficiently conveyed to the jury. Beyond Knox's concession that he wore a wire to record Shults

15  in exchange for a sentence reduction, (*see* Doc. 125 at 133:15-25, 134:1-17), at least five inmates

16  testified about their knowledge of government cooperation in exchange for sentence reductions.

17  (*See, e.g.*, Doc. 124 at 17:4-5, 17:22-25, 20:10-13, 20:24-25, 21:1-5; Doc. 125 at 41:7-13, 43:7-

18  23, 81:11-14; Doc. 126 at 33:7-19, 44:11-17.) FBI Special Agent, Nicholas Callahan, testified to

19  the motivations of inmates who cooperate with the government, including expectations of a

20  reduced sentence or money, or to "get even with someone that's wronged them." (Doc. 124 at

21  29:3-16, 113:7-14.) He also testified about the need to consider an informant's background and

22  "vet" a "jail house tip." (*Id.* at 113:2-6, 113:25, 114-1-4.) In addition to consistently advancing

23  the theory that inmates—particularly Knox—are potentially incredible because they are willing to

24  do nearly anything for a sentence reduction, Shults' counsel drove the point home during closing

25  argument:

26              And being in prison is relevant, obviously, because as we've heard,
            you heard it from Bill Knox himself, nobody wants to be there.
27          *People do just about anything to try to get out early*. That's why we
            have all this RDAP fraud. It is a way to get out, cut some time off
28          your sentence. *Will people literally sell their soul to get out early? I*

*don't think so. But seems like they will come pretty close.*

(Doc. 126 at 100:21-25; 101:1-3 [emphasis added].)

Moreover, as the Supreme Court held in *Richter*, even if a hypothetical expert's testimony has the potential of being useful, counsel may "avoid activities that appear 'distractive from more important duties.'" 562 U.S. at 107 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009)). In *Van Hook*, the Supreme Court rejected petitioner's argument that his attorney should have interviewed additional family members and a psychiatrist who once treated petitioner's mother. 558 U.S. at 11. The Court explained:

> [T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. The ABA Standards prevailing at the time called for Van Hook's counsel to cover several broad categories of mitigating evidence, which they did. And given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents. This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face or would have been apparent from documents any reasonable attorney would have obtained. It is instead a case, like *Strickland* itself, in which defense counsel's decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the range of professionally reasonable judgments.

*Id.* at 11-12 (internal citations, quotation marks, and footnote omitted). Thus, bearing in mind the witnesses called, the testimony elicited, and the theories advanced, Shults fails to meet the heavy burden of proving that counsel's alleged failures were "neither reasonable nor the result of sound trial strategy.'" *Sanchez*, 2021 WL 1192001, at *11; *Ferreira-Alameda*, 815 F.2d at 1254.

4.   Shults fails to demonstrate a reasonable probability of a different outcome

Finally, Shults fails to demonstrate—and there is no indication in the record before the Court—that had the witnesses testified as he suggests that there is a reasonable probability that the trial's outcome would have been different. The proposed testimony is speculative and cumulative without any showing that it is admissible.

As to counsel's failure to call the inmate witnesses and to ask Mr. Assan an additional

1   question, Shults offers nothing more than legal conclusions and bare assertions. (*See* Doc. 175 at

2   7 ["It was ineffective assistance not to ask [Mr. Assan] the question as there is a reasonable

3   probability the jury would have found Shults not guilty or been unable to render a verdict had this

4   testimony been presented."]; *see also* Doc. 175-1 at 10 ["[Mr. Assan's additional] testimony,

5   individually or in combination with Shults' own testimony, would have—within a reasonable

6   probability—resulted in the jury returning a verdict of not guilty instead of guilty."]; *id*. at 9

7   ["Shults was prejudiced by this error because testimony from these [additional inmate] witness

8   [sic] in combination with Shults' own testimony would have been enough to create reasonable

9   doubt in the jury's mind."].) This is obviously insufficient. *Borg*, 24 F.3d at 26 ("Conclusory

10   allegations which are not supported by a statement of specific facts do not warrant habeas

11   relief."); *Neighbors*, 457 F.2d at 795 (affirming denial of § 2255 motion where allegations were

12   conclusory and without support in the record).

13        With respect to the proposed expert testimony, Shults makes two distinct, albeit related,

14   arguments. First, he argues Mr. Gunja's testimony "would have been critical for the jury to hear

15   because it would have provided factual clarity about prison life and the efforts inmates will take

16   sometimes to get a sentence reduction. Had this testimony been presented, there is a reasonable

17   probability the jury would have found Shults not guilty or been unable to return a verdict." (Doc.

18   175 at 8.) However, as explained *supra*, the testimony would have been cumulative, not critical.

19   Even so, Shults does not explain how such testimony would create a probability "sufficient to

20   undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Leonti*, 326 F.3d at 1120.

21        Shults also asserts "[t]here is a reasonable probability that had [the expert] testimony been

22   given the jury would have returned a verdict of not guilty because Gunja's proposed testimony

23   would have helped the jury better weigh the credibility of Knox's testimony—which was key to

24   the jury's finding of guilt." (Doc. 175-1 at 10-11.) Though witness credibility was important in

25   this case, Shults' attorneys went to lengths to emphasize the incredibility of the inmates—

26   particularly, Knox—who cooperate with the government. Further efforts to impeach Knox were

27   unnecessary. *See Dickey*, 231 F. Supp. at 681-82 (rejecting argument that counsel was deficient

28   by failing to present testimony impeaching adverse witnesses where nine other witnesses had

1   testified and potentially impeached them); *see also United States v. Erckert*, 2014 WL 5035184,

2   at *2 (E.D. Cal. Oct. 8, 2014) ("[T]rial counsel had already impeached [a government witness] by

3   introducing several of his prior convictions at trial. The failure to take additional impeachment

4   measures did not present a colorable claim of deficient performance, or prejudice, under

5   Strickland.") (quoting *Smith v. Adams*, 506 F. App'x 561, 564 (9th Cir. 2013)); *Lester v. Ayers*,

6   267 F. App'x 725, 726 (9th Cir. 2008) ("Given this degree of successful impeachment, it is clear

7   that the additional impeachment urged by Lester would not have changed the result of the

8   proceedings.").

9       In addition to thoroughly attacking Knox's credibility on direct examination, Shults'

10   counsel made further impeachment efforts through the testimony of at least three witnesses. For

11   example, Mr. Caro testified that Knox approached him about the idea of making a movie about

12   Knox's life but that he "probably" did not consider it. (*See* Doc. 126 at 31:2-7.) Knox, on the

13   other hand, testified that it was Mr. Caro who wanted to make the movie. (Doc. 125 at 215: 17-

14   25; 216:1-5.) Also, as previously mentioned, Mr. Caro testified to the statements Knox made

15   about Shults' case, (*see* Doc. 126 at 32:1-25, 33:1-19), while Knox testified that he never talked

16   to Mr. Caro about the case. (Doc. 125 at 217:7-13.) Knox also testified that he told FBI Agent

17   Callahan that Shults had made a threat to harm Judge Guilford at a meal when and fellow inmate,

18   William Ison was present. (*Id.* at 125:24-25, 126:1-8.) However, Mr. Ison testified that this didn't

19   happen, and, in fact, he never heard Shults make such a threat. (*See id.* at 16:9-14.) Darcy Smith,

20   a senior inspector for the U.S. Marshals Service, likewise testified that when interviewing Mr.

21   Ison in connection with the alleged threats, Mr. Ison stated that he never heard Shults claim he

22   wanted to kill his judge and he was not "there," contradicting Knox's account. (*Id.* at 101:11-25.)

23   Thus, the record reflects thorough efforts to impeach Knox, which required the jury to weigh his

24   credibility.[11]

25       Again, Shults fails to explain how the proposed testimony would have had more than a

26

27   ───────────────

[11] In addition to counsel's attack on Knox's credibility, the Court also instructed the jury that because

28   Knox received or expected to receive a benefit from the government in connection with the case, it should
consider the extent to which or whether his testimony may have been influenced by that factor and take
greater caution in examining his testimony than that of other witnesses. (*See* Doc. 126 at 75:5-15.)

1  conceivable effect on the trial, and thus, has not demonstrated a reasonable probability that but for

2  counsel's errors, the trial's outcome would have been different. *Strickland*, 466 U.S. at 693

3  (holding that the effect on the outcome of a proceeding cannot be "conceivable" because

4  "virtually every act or omission of counsel would meet that test"); *Ramirez*, 2012 WL 2050430, at

5  \*11 ("The prejudice prong requires a showing that the likelihood of a different result was

6  substantial, not just conceivable."). In sum, Shults has not met his burden of demonstrating he is

7  entitled to relief on his § 2255 motion. *Strickland*, 466 U.S. at 696; *Quintero-Barraza*, 78 F.3d at

8  1348.

9         **C.**     **An evidentiary hearing is not warranted**

10       Shults requests an evidentiary hearing on his § 2255 motion, asserting that his allegations

11  are not conclusively refuted by the record. (Doc. 175-1 at 11; Doc. 191.) However, as the

12  government accurately contends, an evidentiary hearing is not required in this case. (*See* Doc. 187

13  at 50-51.)

14       A § 2255 motion does not automatically entitle a movant to an evidentiary hearing. A

15  hearing is only required where "the movant has made specific factual allegations that, if true, state

16  a claim on which relief could be granted." *Schaflander*, 743 F.2d at 717 (quoting *United States v.*

17  *Hearst,* 638 F.2d 1190, 1194 (9th Cir. 1980)). Under this standard, courts should grant a hearing

18  "[u]nless the motion and the files and records of the case conclusively show that the prisoner is

19  entitled to no relief[.]" 28 U.S.C. § 2255(b); *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th

20  Cir. 1994), *as amended* (May 6, 1994); *see also United States v. Withers*, 638 F.3d 1055, 1062-63

21  (9th Cir. 2011) ("[A] district court may summarily dismiss a § 2255 motion only if the allegations

22  in the motion, when viewed against the record, do not give rise to a claim for relief or are

23  'palpably incredible or patently frivolous.'") (quoting *Schaflander*, 743 F.2d at 717).

24       Though the standard for obtaining an evidentiary hearing under § 2255(b) is "not high,"

25  the petitioner bears the burden of showing that such a hearing is required. *Christensen v. United*

26  *States*, 2020 WL 1672771, at \*7 (D. Ariz. Apr. 6, 2020) ("The burden is on the Petitioner to show

27  his entitlement to relief under § 2255 including his entitlement to an evidentiary hearing.")

28  (internal quotation marks omitted); *see also United States v. Rodrigues*, 347 F.3d 818, 824 (9th

1  Cir. 2003) (petitioner must "do more than simply allege a 'conflict' or baldly assert that the

2  asserted conflict had an 'adverse effect'") (quoting *United States v. McMullen*, 98 F.3d 1155,

3  1159 (9th Cir. 1996)). Finally, "merely conclusionary statements in a [section] 2255 motion are

4  not enough to require a hearing." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993)

5  (citing *Hearst*, 638 F.2d at 1194); *see also Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir.

6  1989) (same); *United States v. Quan*, 789 F.2d 711, 715 (9th Cir. 1986) ("Where a prisoner's

7  motion presents no more than conclusory allegations, unsupported by facts and refuted by the

8  record, an evidentiary hearing is not required.").

9      Shults has not met his burden of showing entitlement to relief or an evidentiary hearing.

10  His sole argument in support of his request for a hearing is that the allegations are not

11  conclusively refuted by the record. (Doc. 175-1 at 11; Doc. 191.) This is insufficient. *Christensen*,

12  2020 WL 1672771, at *7; *Rodrigues*, 347 F.3d at 824. Without belaboring the point further,

13  Shults' bare assertions and legal conclusions are unsupported by the record and will not suffice to

14  entitle him to relief or an evidentiary hearing. The record conclusively shows that Shults did not

15  suffer prejudice from any alleged deficient conduct of defense counsel. Thus, the motion makes

16  no claim entitling Shults to relief and a hearing is not warranted. 28 U.S.C. § 2255(b); *Blaylock*,

17  20 F.3d at 1465; *Johnson*, 988 F.2d at 945.

18      **D.    Certificate of appealability**

19      The Court declines to issue a certificate of appealability in connection with his 28 U.S.C.

20  § 2255 motion. A court may issue a certificate of appealability where the moving party has "made

21  a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2); *United*

22  *States v. Zuno-Arce*, 339 F.3d 886, 888 (9th Cir. 2003). "Where a district court has rejected the

23  constitutional claims on the merits . . . [t]he petitioner must demonstrate that reasonable jurists

24  would find the district court's assessment of the constitutional claims debatable or wrong." *Zuno-*

25  *Arce*, 339 F.3d at 888-89 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Any doubts

26  about whether a petitioner has met this standard must be resolved in his favor. *Silva v. Woodford,*

27  279 F.3d 825, 833 (9th Cir. 2002) (citing *Slack*, 529 U.S. at 483-84).

28      For the reasons previously stated, Shults has not made a substantial showing of the denial

of a constitutional right. He does little to persuade the Court otherwise; his motion is bereft of factual support or reference to evidence in the record. Shults has therefore not demonstrated that reasonable jurists would find this Court's assessment of his claims debatable or wrong. *Slack*, 529 U.S. at 484.

**IV.     Conclusion and Order**

Based upon the foregoing, the Court **ORDERS**:

     1.     Shults' 28 U.S.C. § 2255 motion (Docs. 154, 175) is **DENIED**.

     2.     Shults' request for an evidentiary hearing is **DENIED**.

     3.     The Court **DECLINES** to issue a certificate of appealability.

IT IS SO ORDERED.

    Dated:   **January 3, 2024**

UNITED STATES DISTRICT JUDGE

31